WILLIAM P. SAUFLEY AND WIFE v. RACHEL F. JACKSON.

Where, in a suit by a parent to set aside a deed of gift to a child, the jury found
for the plaintiff, without any evidence of undue influence or improper con-
duct on the part of the child, and the Court below refused to grant a new
trial, the judgment was reversed.

Error from Cass.   Tried before the Hon. W. W. Morris.

The facts are stated in the Opinion.  The law was correctly
given in charge by the Court below.

*T. J. & J. H. Rogers*, and *J. T. Mills* and *T. J. Jennings*,
for plaintiffs in error.

*Morrill & Dickson*, for defendants in error.

LIPSCOMB, J.  This suit was instituted by the appellee against
the appellants, to set aside a voluntary deed of gift of certain
slaves to Eliza Saufley, the wife of her co-appellant, and daugh-
ter of the appellee, on the ground of undue influence exercised
in procuring it.   There was a verdict and decree in favor of
the appellee.   A motion was made to set aside the verdict, on
the ground of its being contrary to the evidence, which was
overruled and an appeal taken.

The petition contains a great deal that might well have been
omitted, and in the language of Lord Eldon, in a case hereaf-
ter to be more particularly referred to, " there is much foul
allegation which, if not true, ought not to have been there."
(14 Vez. Je. 290.)   We do not intend by this, to cast any re-
flection whatever on the learned counsel who drafted the peti-
tion ; because we are well aware how very difficult it is for
counsel at all times to restrain and control a party in the con-
struction of the petition, and particularly a female client.   To

them it often appears important to allege matter immaterial, and that, too, in their own strong language.

We propose to discuss the principles upon which voluntary settlements have been set aside, as made under an undue influence.

There are certain relations in life which, from the peculiar confidence necessarily subsisting, Courts of Equity feel bound to guard and protect from any undue influence. These are guardians and their wards, masters and servants, trustees and *cestui que trust*, and parents and children; and transactions between persons occupying such fiduciary relations, are viewed with a jealous vigilance; and if the least scintilla of fraud or unfairness is practiced, Courts, in the exercise of equity jurisdiction, will set such transactions aside. Judge Story says, " The general principle which governs in all cases of this sort " is, that if a confidence is reposed, and that confidence is " abused, Courts of Equity will grant relief." (Bottom of page 339, Story's Equity, 1 Vol.) When confidence, reposed in any of these relations has been abused, Courts of Equity will interpose and protect the injured, in cases where there would be no relief if the parties did not occupy these confidential relations. The same learned author, just quoted, says, " In this " class of cases there is often to be found some intermixture of " deceit, imposition, overreaching, unconscionable advantage, " or other mark of deceit and positive fraud. But the prin- " ciple upon which Courts of Equity act in regard thereto, " stands, independent of any such ingredients, upon a motive ; " and is designed, in some degree, as a protection to the par- " ties, against the effects of overweening confidence and self- " delusion, and the infirmities of hasty and precipitate judg- " ment. These Courts will therefore often interfere in such " cases where, but for such peculiar relation, they would either " abstain wholly from granting relief, or would grant it in a " very modified and abstemious manner." (Story Eq., Sec. 307.) In the exercise of jurisdiction in such cases, the Courts

do not feel themselves authorised to interfere and set aside a
voluntary contract, on the notion that an honorable man would
not make such a contract ; nor to prevent a voluntary or other
act of a man whereby he strips himself of his property.   But
they require, by a rule of technical morality, that if confidence
is reposed, it must be faithfully acted upon and preserved from
any intermixture of imposition.   If influence is acquired, it
must be kept free from the taint of selfish interest and cunning
and overreaching bargains.   If the means of personal control
are given, they must always be restrained to purposes of good
faith and personal good.   Courts of Equity will not, therefore,
arrest or set aside an act or contract merely because a man of
more honor would not have entered into it.   There must be
some relation between the parties which compels the one to
make a full discovery to the other, or abstain from all selfish
projects.   But when such a relation does exist, Courts of Equity,
acting upon this superinduced ground, in aid of general morals,
will not suffer one party, standing in a situation of which he
can avail himself against the other, to derive advantage from
that circumstance ; for it is founded in a breach of confidence.
(Story Equity, 1 Vol., Sec. 308.)

   These are the general rules governing relations of particular
confidence, arising from the position of the parties.   But the
same rule does not apply with equal rigor to all of these rela-
tions.   A settlement made by a parent on a child, so far from
being regarded with jealousy, will always be presumed to be
free from suspicion ; because it is the natural course for pro-
perty to take.   One of the main objects of the acquisition of
property by the parent, is to give it to his child ; and that
child in turn will give it to his, and in this way the debt of
gratitude we owe to our parent is paid to our children.
Each generation pays what it owes to the preceding one, to
the succeeding one.   This seems to be the natural law for the
transmission of property.   But when a contract is made be-
tween persons standing in the relation of parent and child, for

the benefit of the parent, it invites the severest scrutiny ; and if it is not perfectly clear that the parent has used no undue influence to procure such settlement in his favor, Courts of Equity will set aside such contract, in favor of the child. Judge Story, in discussing the subject, says : " The natural and just " influence which a parent has over a child, renders it pecu- " liarly important for Courts of justice to watch over and pro- " tect the interest of the latter ; and therefore all contracts " and conveyances, whereby benefits are secured by children " to their parents, are objects of jealousy, and if they are not " entered into with scrupulous good faith, and are not reason- " able, under the circumstances, they will be set aside unless " third persons have acquired an interest under them ; espe- " cially where the original purposes for which they have been " obtained are perverted, or used as a mere cover.   The same " principle applies to a voluntary gift to a person who has put " himself *in loco parentis*.   But we are not to indulge in sus- " picions of jealousy, or to make unfavorable presumptions as a " matter of course in cases of this sort.   It is undoubtedly the " duty of Courts carefully to watch and examine the circum- " stances attending transactions of this kind, when brought " under review before them, to discover if any undue influence " has been exercised in obtaining the conveyance.   But to con- " sider a parent disqualified to take a voluntary deed from his " child, without consideration, on account of their relationship, " is assuming a principle at war with all filial as well as pa- " rental duty and affection, and acting on the presumption that " a parent, instead of wishing to promote the interest and wel- " fare, would be seeking to overreach and defraud his child. " Whereas, the presumption ought to be, in the absence of all " proof tending to a contrary conclusion, that the advancement " of the interest of the child was the object in view ; and to " presume the existence of circumstances conducing to that re- " sult.   Such a presumption harmonizes with the moral obli- " gations of a parent to provide for his child, and is founded

Saufley v. Jackson.

" upon the same benign principle that governs cases of pur-
" chases made by parents in the name of a child. The *prima*
"*facie* presumption is that it was intended as an advancement
" to the child, and so not falling within the principle of a re-
" sulting trust. The natural and reasonable presumption in
" all transactions of this kind, is that a benefit was intended
" the child; because in the discharge of a moral, parental
" duty. And the interest of the child is abundantly guarded
" and protected, by keeping a watchful eye over the transac-
" tion, to see that no undue influence was brought to bear upon
" it." (Story Eq., Sec. 309.) Very nearly the whole of the
preceding Section was literally copied by the learned author
from the Opinion of the Supreme Court of the United States,
in the case of Jenkins v. Pye, 12 Peters, R. 253, 254. The
opinion of the Court was delivered by Judge Thompson, and
immediately preceding the passage cited by the author, the
Judge said, " But the grounds mainly relied upon to invalidate
" the deed were, that being from a daughter to her father ren-
" dered it at least *prima facie* void, and if not on this ground,
" it was so, because it was obtained by the undue influence of
" paternal authority. The first ground of objection seeks to
" establish the broad principle that a deed from a child to a
" parent, conveying the real estate of the child, ought, from
" from considerations of public policy growing out of the rela-
" tion of the parties, to be deemed void ; and numerous cases
" in the English Chancery have been referred to, which are
" supposed to establish this principle. We do not deem it ne-
" cessary to travel over all these authorities ; we have looked
" into the leading cases and cannot discover any thing to war-
" rant the broad and unqualified doctrine contended for on the
" part of the appellees. All the cases are accompanied with
" some ingredient showing undue influence exercised by the
" parent, operating upon the fears and hopes of the child ; and
" sufficient to show reasonable grounds to presume that the act
" was not perfecty free and voluntary on the part of the child ;

" and in some cases, although there may be circumstances tend-
" ing in some small degree to show undue influence; yet, if the
" agreement appears reasonable, it has been considered enough
" to outweigh light circumstances, so as not to affect the deed.
" It becomes the less necessary for us to go into a critical exa-
" mination of the English Chancery doctrine on this subject,
" for should the cases be found to countenance it, we should
" not be disposed to adopt or sanction the broad principle con-
" tended for, that the deed of a child to a parent is to be
" deemed *prima facie* void."

It is seen that the act or contract by which a benefit is con-
ferred by the child, will be set aside if there are any circum-
stances showing that an undue influence of parental authority
has been used to procure such benefit to the parent; and it
was a vexed question whether the mere existence of the rela-
tionship of the parent did not of itself make the transaction
*prima facie* void; and, from the argument of eminent counsel
in the case of Jenkins v. Pye, just cited, this doctrine received
countenance, if not sustains this principle broadly, as contend-
ed for by counsel in the English Chancery. It seems, however,
now to be repudiated by the Courts of our country; and it
has been modified in the English Courts; and it seems that
the modification has extended to transactions between persons
occupying confidential relations, even to the relationship of
attorney and client, trustee and *cestui que trust*, since the case
of Hinton v. Atkins, decided by Lord Brougham. (3 McKeen,
113.)

But it is clear that this rule was never applied, neither un-
qualified or qualified, to a deed or gift from a parent to a child;
and the reverse of such principle has always been sustained;
and there is not believed to be a single exception to the prin-
ciple, that a deed from a parent to a child, is always regarded
with a favorable eye, and every presumption is in favor of its va-
lidity. The case of Whelan v. Whelan, 3 Cowen, 537, relied
on by the counsel for the appellee, is certainly no exception. In

that case fraud, gross and palpable, was practised by the son, and false and fraudulent representations were made by him to his father, for the purpose of procuring the deed ; so much so, that it would have invalidated the deed if the parties had been strangers, and contracted at arm's length with each other.

Before attempting to apply the principles we have collated and discussed, to the case at bar, it is proper to discuss another question of law raised in the argument. It is presented by the following proposition : That if fraud and undue influence have been used in procuring the deed it is void, although it may not be proven that those who receive the benefit under the deed had any participation in procuring it. The authority most relied upon by the counsel for the appellee, in support of this proposition, is Huguenin v. Basely, 14 Vesey jr. 273. It has been regarded as a leading case upon this question. It is a case remarkable for the great ability displayed by the counsel, and the Judge who decided the case ; and it is exceedingly gratifying to all who can appreciate the honor of the bench and bar, to see in this case the laurels of both so harmoniously and happily blended together. And it may truly be said, that although Sir Samuel Romiley established his reputation for talents and law learning, that none has ever surpassed, and but few hope to equal, and such was the power and effect on those who had the happiness to hear, that Lord Cottingham, thirty years after, declared that he could not recur to it without experiencing a thrill of delight ; yet the fame and well earned reputation of the great Lord Eldon was not in the slightest degree impaired ; but their names have come to us, and will go down future centuries, as the greatest Counsellor and the greatest Jurist of the age in which they lived.

The bill was filed to set aside a deed in favor of the wife and children of Basely, and alleged to be procured through his fraudulent practices, availing himself of an undue spiritual influence by him over the mind of the complainant. The Lord Chancellor Eldon said, " With regard to the interests of the

" wife and children of the defendant, there was no personal
" interference upon their part in the transactions that have
" produced this suit. If, therefore, these estates are to be taken
" from them, that relief must be given with reference to the
" conduct of other persons ; and 1 should regret that any doubt
" could be entertained whether it is not competent to a Court
" of Equity to take away from third persons the benefits which
" they have derived from the fraud, imposition, or undue influ-
" ence of others." He then refers to the case of Bridgeman v.
Green, (2 Vesey 627, and Wilson, 58,) as a case in point, in
which Lord Ch. Justice Wilmot declared that, " There is no
" pretence that Green's brother, or his wife, was party to any
" imposition, or had any due or undue influence over the plain-
" tiff ; but does it follow from thence, that they must keep
" the money ? No : whoever received it must take it tainted
" and infected with the undue influence and imposition of
" the person procuring the gift ; his partitioning it out
" among his friends and relatives will not purify the gift and
" protect it against the equity of the person imposed upon.
" Let the hand receiving it be ever so chaste, yet if it comes
" through a polluted channel, the obligation of restitution will
" follow it."

The doctrine of this case seems to have been regarded as
sound and correct, in the case of Whelan v. Whelan, in 3
Cowan, cited in another branch of this case, and may, in gene-
ral, be regarded as settled law ; but how far it should be qual-
ified is not necessary in the case before us to decide ; but if
property so acquired had passed into the hands of innocent
purchasers for fair valuation, without notice, I should, in such
case, be very far from yielding my assent to the concluding
part of the remarks of Lord Ch. J. Wilmot, cited above. It
is not necessary to extend the discussion on this subject fur-
ther.

The conclusions to which we have arrived, from the investi-
gation we have made, are, that Mrs. Saufley being the daugh-

ter of Mrs. Jackson, every presumption is in favor of the validity and fairness of the deed made by her mother to her ; that to set aside the deed so made by the mother, it must be proven, without the aid of presumption, that she had been fraudulently practiced upon by some person or persons, for the purpose of procuring the deed, and that it was so procured.

A brief reference to the facts will suffice. The mother, about fifty years of age, had been married three times, and was divorced from her third and last husband ; lived with her daughter, her only child by her second husband. From the evidence, she was a woman of great energy and determination of will, and well able to act for herself. She lived for some time after her divorce from her husband, with her daughter ; seemed to be happily situated, and was treated by her daughter with great kindness and respect ; expressed to a friend her determination to make the deed some time before it was executed ; and on his advising her not to do so, lest she might become dissatisfied, insisted that she would do so, and gave several reasons for doing it, and, among others, that part of the property came to her by the death of a son by her first husband, whose dying request was that she would give it to his half sister, Mrs. Saufley ; that she could live without it. Some considerable time after she had executed the deed, she declared to the same friend that she had made it, and was glad she had done it. There was no evidence that her daughter, nor her son-in-law, had used the slightest efforts to influence her, nor that any one else had exerted an influence directly or indirectly to induce her to make the deed. None of her own witnesses proved the slightest circumstance to raise a presumption of any trick or device, to give any one an ascendency over her, or any attempt to influence her to execute the deed ; and if the deed could be set aside, it would be by presuming an influence based upon the mere facts of the relation of parent and child, and that she had been kindly received into the house of her son-in-law, and had been well treated by him and her daugh-

ter. To presume any thing unfavorable from these facts, would be in direct opposition to the well established principles governing such transactions, as has been abundantly shown. We are clear that there was no evidence to support the verdict of the jury, and that the Court below erred in overruling the motion for a new trial. The judgment is therefore reversed and the cause remanded.

Reversed and remanded.